## FRANCIS v. CRAFTS.

### No. 4712.

United States Court of Appeals
First Circuit.

April 22, 1953.

Isadore H. Y. Muchnick, Boston, Mass., for appellant.

Herbert L. Barrett, Boston, Mass., for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

Here again is a complaint for damages under the Civil Rights Act, 8 U.S.C.A. § 43, filed in the court below pursuant to the jurisdictional provisions of 28 U.S.C. § 1343(3). The action was brought against a

large number of officials of the Commonwealth of Massachusetts, including the present appellee, the Honorable Frederic A. Crafts, Special Justice of the Second District Court of Eastern Middlesex.

So far as concerns Judge Crafts, the complaint alleged that on March 19, 1940, in utter disregard of plaintiff's constitutional rights, this defendant, in his capacity as Special Justice of the Second District Court of Eastern Middlesex, sentenced the plaintiff, then 17 years of age, as a "defective delinquent", and ordered him committed to the custody of the superintendent of the State Farm at Bridgewater, Massachusetts; that this commitment was ordered in an *ex parte* proceeding, of which the plaintiff received no notice; that plaintiff was not present at the hearing before Judge Crafts nor represented there by counsel or any other person acting on his behalf; that by virtue of said commitment order he was restrained of his personal liberty at the State Farm until April 27, 1948, when he was by administrative action transferred to the Massachusetts Reformatory at Concord, where he remained incarcerated until he was ultimately released on November 28, 1951, as the result of a petition for a writ of habeas corpus addressed to the Superior Court for the County of Suffolk; that defendant Crafts, and his codefendants, acting severally under color and purported authority of the statutes of Massachusetts, subjected the plaintiff to the deprivation of rights, privileges, immunities and guaranties secured by the Constitution of the United States, all to the plaintiff's damage in the sum of $500,000.

Defendant Crafts moved for summary judgment upon the ground, among others, that as a Justice of the said court "this defendant is immune from any action against him on account of his official acts as such a justice and is not liable to answer to the plaintiff in this case as a matter of law."

Accompanying the motion was an affidavit by Judge Crafts reciting, in part, as follows: On March 19, 1940, a report was made to him in his official capacity by the superintendent of the Walter E. Fernald State School, "which was a school for the feeble minded within the jurisdiction of this defendant, to the effect that the plaintiff was an inmate of said school and was not a proper subject for retention therein because of his misbehavior as set forth in the said report," which report requested that plaintiff be transferred to the Department of Mental Delinquents at Bridgewater, pursuant to Chap. 123, Mass. Gen.Laws (Ter.Ed.) § 113 et seq., as amended. Notice was given to the Department of Mental Health, pursuant to § 116 of Chap. 123, and said department caused the plaintiff to be examined by two experts in insanity with a view to determining whether or not the plaintiff was an improper subject to be retained in the said school. The Department of Mental Health caused a written report to be made to the defendant by two physicians, both of whom were well known to the defendant and in whom he had confidence. The defendant made inquiry into the facts, and being satisfied from the foregoing that the plaintiff was not a fit subject for retention in the said school entered an order in his judicial capacity for the removal of the plaintiff as requested in the application by the superintendent of the school and in accordance with the provisions of Mass.Gen.Laws, Chap. 123, § 116. At the time of making inquiry into the facts, defendant was informed and believed that the plaintiff was an inmate of the Walter E. Fernald State School as the result of a voluntary admission pursuant to Mass.Gen.Laws, Chap. 123, § 47. Defendant was further informed and believed that the mother of the plaintiff, who was then still a minor, was present at the said school on March 19, 1940, "and was notified of the request being made for the removal of the plaintiff therefrom and that she assented to such removal". Further the affidavit recited that the said order for removal "entered by this defendant in his judicial capacity was merely an order for removal of the plaintiff from one institution to another in order that he might receive a more suitable type of care." Attached to the affidavit were certified copies of the aforesaid report and application for transfer filed by the superintendent of the school, of the report of the two physicians on behalf of the Department of Mental Health, and of the order of removal, above referred to, issued by the defendant on March 19, 1940.

In this state of the record the plaintiff also moved for summary judgment on the ground that there was no material issue of fact to be tried and that the plaintiff was entitled to summary judgment as a matter of law.

After a hearing on the motions for summary judgment, the district court allowed the defendant's motion, and on December 15, 1952, entered judgment dismissing the complaint as to defendant Crafts. In a memorandum of decision filed December 8, 1952, Judge Ford argues persuasively that the Civil Rights Act should not be interpreted as overturning the time-honored immunity of judges from civil liability for their official acts. 108 F.Supp. 884.

Plaintiff duly filed a notice of appeal from the aforesaid "final judgment". Since in his memorandum the district judge expressly determined that there was no just reason for delay and expressly directed the entry of judgment as to the defendant Crafts, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, 28 U.S. C., the case is now properly before us on appeal. Boston Medical Supply Co. v. Lea & Febiger, 1 Cir., 1952, 195 F.2d 853, 855. Appellee has not questioned our appellate jurisdiction.

We are clearly of the opinion that the judgment of the district court should be affirmed.

In the recent case of Cobb v. City of Malden, 1 Cir., 202 F.2d 701, we had occasion to say that the apparently sweeping and unqualified language of the old Civil Rights Act, 8 U.S.C.A. § 43, "seems to say that every person in official position, whether executive, legislative, or judicial, who under color of state law subjects or causes to be subjected any person to the deprivation of any rights secured by the Constitution of the United States, shall be liable in damages to the person injured. The enactment in terms contains no recognition of possible defenses, by way of privilege, even where the defendants may have acted in good faith, in compliance with what they believed to be their official duty. Reading the language of the Act in its broadest sweep, it would seem to make no difference that the conduct of the defendants might not have been tortious at common law; for the Act, if read literally, creates a new federal tort, where all that has to be proved is that the defendants as a result of their conduct under color of state law have in fact caused harm to the plaintiff by depriving him of rights, etc., secured by the Constitution of the United States." We went on to say that fortunately Tenney v. Brandhove, 1951, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019, "has relieved us of the necessity of giving the Civil Rights Act such an awesome and unqualified interpretation." That case held that the broadly expressed terms of the Civil Rights Act could not have been intended to deprive state legislators of their pre-existing and well-established complete immunity from civil liability for official acts done within the sphere of legislative activity.

█ It is clear that the immunity of judges from civil liability for acts done in the course of their official functions is no less firmly and deeply rooted in the traditions of Anglo-American law, reaching back to ancient times. See the learned opinion by Chief Justice Kent in Yates v. Lansing, 1810, 5 Johns., N.Y., 282, tracing the origins of this doctrine of judicial immunity back to the days of Edward III. In that case an action of debt was brought against the Chancellor of New York State for a monetary penalty under a state statute expressed in broad terms. Referring to the doctrine of judicial immunity from civil suit, Chief Justice Kent observed, 5 Johns. at page 291: "It is to be found in the earliest judicial records, and it has been steadily maintained by an undisturbed current of decisions in the *English* courts, amidst every change of policy, and through every revolution of their government. A short view of the cases will teach us to admire the wisdom of our forefathers, and to revere a principle on which rests the independence of the administration of justice." Further he said, 5 Johns. at page 296: "Ought such a sacred principle of the common law, as the one we have been considering, to be subverted, without an express declaration to that effect?". Judgment was entered for the defendant, and was affirmed in, 1812, 9 Johns. 395. The

views expressed by Chief Justice Kent met with the approval of Chief Justice Shaw in Pratt v. Gardner, 1848, 2 Cush., Mass., 63. Equally emphatic were the views of the Supreme Court of the United States in the leading case of Bradley v. Fisher, 1871, 13 Wall. 335, 20 L.Ed. 646. There the Court said, 13 Wall. at page 347, 20 L.Ed. 646: "The principle, therefore, which exempts judges of courts of superior or general authority from liability in a civil action for acts done by them in the exercise of their judicial functions, obtains in all countries where there is any well-ordered system of jurisprudence. It has been the settled doctrine of the English courts for many centuries, and has never been denied, that we are aware of, in the courts of this country." Further, the Court held that this immunity is not to be defeated by allegations that the judge acted maliciously or corruptly or from other improper motives. The reason of policy for this broad immunity was stated as follows, 13 Wall. at page 349: "If upon such allegations a judge could be compelled to answer in a civil action for his judicial acts, not only would his office be degraded and his usefulness destroyed, but he would be subjected for his protection to the necessity of preserving a complete record of all the evidence produced before him in every litigated case, and of the authorities cited and arguments presented, in order that he might be able to show to the judge before whom he might be summoned by the losing party—and that judge perhaps one of an inferior jurisdiction—that he had decided as he did with judicial integrity; and the second judge would be subjected to a similar burden, as he in his turn might also be held amenable by the losing party." [In the case at bar it is not even alleged that Judge Crafts acted maliciously or from corrupt motives in issuing the removal order in question.]

 We do not think that Picking v. Pennsylvania R. Co., 3 Cir., 1945, 151 F.2d 240, is a controlling authority. In the first place, the judicial officer involved in that case was a justice of the peace, not a judge of a court of general jurisdiction, as in the case at bar. A possible distinction might be taken on this score; but see Pratt

v. Gardner, 1848, 2 Cush., Mass., 63, 70. More important, the Picking case was decided in 1945, without benefit of the illumination and compelling analogy to be found in the opinion of the Supreme Court in Tenney v. Brandhove, supra, which came down several years later. In view of the discussion in the latter case, we have no doubt that the Third Circuit would no longer feel obliged, as it did in the Picking case, to read the Civil Rights Act in such literal and unqualified manner as to impose a liability for damages upon a state judicial officer for acts done in the exercise of his judicial function. Certainly it would be absurd to hold, in the application of the Civil Rights Act, that judicial officers of a state stand in any less favorable position than do state legislators, in respect to immunity from civil liability for acts done in their official capacity.

The judgment of the District Court is affirmed.